# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| KATHERINE KELLEY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:10-cv-00451-DBH |
| | ) | |
| CORRECTIONAL MEDICAL | ) | |
| SERVICES INC., | ) | |
| | ) | |
| Defendant | ) | |

## RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Katherine Kelley filed suit against her former employer, Correctional Medical Services Inc., asserting claims of disability discrimination and defamation. Following the close of discovery, Correctional Medical Services filed a motion for summary judgment, seeking the dismissal of all counts. The Court referred the motion for report and recommendation pursuant to 28 U.S.C. § 636. Based on the following report of the summary judgment record and discussion of the same, I recommend that the Court grant the motion.

### SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  By local rule, summary judgment facts are introduced by means of "a separate, short, and concise statement of material facts," which statements must be supported by record citations.  D. Me. Loc. R. 56(b), (c).  The Court's review of the record is guided by the moving party's statement, the non-moving party's opposing statement, including any additional statement, and the moving party's limited reply statement.  D. Me. Loc. R. 56(b), (c), (d);  see also Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).  Appropriate record sources include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

The non-moving party is entitled to have the summary judgment facts considered in the light most favorable to her cause.  Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011).  Because many factual disputes depend on circumstantial evidence, to determine whether a fact is established, circumferentially, the Court will draw all reasonable inferences in favor of the non-movant that can be supported by the record sources she cites.  However, where the non-movant bears the burden of proof, she still must present "definite, competent evidence" from which a reasonable person could find in her favor.  Torrech-Hernandez v. GE, 519 F.3d 41, 47 n.1 (1st Cir. 2008) ("While it is true that in the summary judgment context all *reasonable* inferences must be drawn in favor of the non-moving party, the District Court is not obliged to accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement made to the Court by a party.").  If the Court's guided review of the record reveals evidence sufficient to support a judgment in favor of the non-moving party on one or more of her claims, then there is a trial-worthy controversy and summary judgment must be

denied to the extent there are supported claims. Unsupported claims are properly dismissed.

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the

summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

<h2 style="text-align:center">STATEMENT OF FACTS</h2>

The parties' statements of material facts consist of the Defendant's Statement of

Undisputed Material Facts, the Plaintiff's Response to Defendant's Statement, the Plaintiff's

Statement of Material Facts, and the Defendant's Reply Statement of Material Facts. The

following presentation begins with facts drawn from the Defendant's Statement (Def.'s Stmt.,

Doc. No. 15) and the Plaintiff's Response (Pl.'s Response Stmt., Doc. No. 22).

Correctional Medical Services (CMS) provides medical staffing and health care services

for the inmate population at the Maine State Prison. Katherine Kelley is a licensed practical

nurse (LPN) and she worked for CMS along with approximately 35 other nurses at the Maine

State Prison. Teresa Kesteloot served as Health Services Administrator for CMS and she

oversaw the work of the nurses, who reported directly to her. The nurses work around the clock,

in three shifts: day (7:00 a.m. – 3:30 p.m.), evening (3:00 p.m. – 10:30 p.m.), and night (10:00

p.m. – 7:30 a.m.).

Health services are provided at the prison in five locations: a main clinic; an infirmary; a

close unit; a medium unit, and a special management unit. (Def.'s Stmt. ¶¶ 1-3, 5-10.) The

infirmary and main clinic locations are adjacent to one another. The close unit refers to a

location separate from the clinic and infirmary, where medication is passed to inmates. The

medium unit is located farther away from the clinic and infirmary—compared to the close unit—

and refers to the custody level of the inmates that are housed at that location. The special

management unit is where serious psychiatric patients are held, as well as other inmates who

need to be isolated. Nurses are assigned to work at one of the five locations. (Id. ¶¶ 11-15.) An LPN can work in any of the five locations at the prison provided there is a registered nurse (RN) on duty. (Id. ¶ 19; Pl.'s Response Stmt. ¶ 19.)

Although Kelley's regular shift transpired in the close unit (Def.'s Stmt. ¶ 20), in this case the relevant locations are the infirmary and the main clinic. The relevant shift is the night shift. During the night shift, the medium and close units are not staffed with nurses, but a nurse goes to each in the early morning hours of the night shift to set up medications for distribution to prisoners in the morning. (Id. ¶¶ 24-25.) In addition to the close unit, Kelley had worked in both the infirmary and in the special management unit. She also came to be familiar with working in the main clinic. Kelley's assignments sometimes changed on short notice. (Id. ¶¶ 22-23, 34.)

The duties of nurses working in the infirmary include such things as getting reports, counting narcotics and charts, checking on patients, bathing patients, moving patients, transferring patients, assisting in feeding patients, hanging IVs and doing dressing changes. In the main clinic, inmates come in with medical problems that may require assistance, but they do not stay in the main clinic, like they would in the infirmary. Inmates who come to the main clinic typically go on from there to the hospital, the infirmary, or back to a cell. (Id. ¶¶ 16-17.) When an inmate medical emergency arises, it is called a "code blue." A code blue typically requires medical personnel on duty to respond to the location where the inmate is located as quickly as possible with a stretcher and emergency medical equipment. (Id. ¶ 18.)

On July 23, 2007, Kelley suffered a serious horse-riding accident that resulted in a fractured pelvis. (Id. ¶ 26.) She returned to work, subject to certain medical restrictions. By July 2008, Kelley's medical restrictions called for the use of a cane and limited her to working shifts not in excess of ten and a half hours. (Id. ¶¶ 30-31.) Because Kelley was restricted to one

shift, she could not be "mandated," a procedure in which the employer requires the employee to remain on duty if another employee calls out and no one else is available for cover. (Id. ¶¶ 38-39.)

Kelley's medical restrictions also counter-indicated bending and squatting. (Pl.'s Response Stmt. ¶ 32.) Kelley asserts that she was also restricted in terms of "walking any distance with her cane because one leg was shorter than the other." (Id.) However, the deposition transcript she cites does not support her assertion concerning "any distance" walking. To the contrary, it indicates that Kelley has testified that she did on occasion respond to code blues and that she was capable of walking between stations using her cane. (Kelley Dep. Tr. 43-44; see also Def.'s Stmt. ¶ 35 and Pl.'s Response Stmt. ¶ 35.) The physician's notes reinforce that Kelley was not precluded from "walking any distance." (Kelley Dep. Tr. Exs. 7 & 8, Doc. Nos. 15-11 & 15-12.) For three months following her return to work, Kelley primarily worked in the infirmary and the clinic and she responded to some code blues in this time. (Def.'s Stmt. ¶¶ 34, 36; Pl.'s Response Stmt. ¶ 36.)

Kelley reported to work the night shift on October 17, 2008, after she received a call from Violet Hanson, who asked her if she would be willing to take a shift for an employee who called out. Ms. Hanson also told Kelley that a medical technician had been terminated and stated that she could come in at 3:00 a.m. to prepare the medications in the close unit and leave after they were passed to inmates later than morning. Kelley agreed, though she was on vacation at the time. During the conversation, it was agreed that Kelley could come in to work the entire night shift, instead of coming in at 3:00 a.m. Kelley arrived at work around 10:00 p.m. (Def.'s Stmt. ¶¶ 42-48.) By that time, a second employee had called out of work that evening, which meant that CMS had to reshuffle employees for the night shift. (Id. ¶ 49.) It is undisputed that there

5

would be no need to station a nurse in the close unit prior to 3:30 a.m., when it would be time to set up the medications. (Id. ¶ 50.) Ultimately, it was directed that Kelley would work in the main clinic. How that came to pass and whether it was appropriate in light of Kelley's medical restrictions are at the heart of this dispute.

When Kelley arrived that evening, the RN on duty in the main clinic was Bruce Lumsden, who was finishing the evening shift. (Id. ¶¶ 51-52.) Kelley observed that the schedule reflected that she would not be working the close unit. (Id. ¶ 53.) Another RN on duty when Kelley arrived was Deborah Hill, who had worked through both the first and second shifts that day. (Id. ¶¶ 54-55.) Hill remained beyond the end of the second shift, however, because there was difficulty determining who would work in the clinic (where Kelley had been scheduled) and who would work in the infirmary (where Ann Voorhees, RN, had been scheduled). (Id. ¶¶ 56-58; Pl.'s Response Stmt. ¶ 58.)

When Kelley saw the schedule, she asked Lumsden if she could be accommodated by working in the infirmary, effectively switching assignments with Voorhees. (Pl.'s Response Stmt. ¶ 58.) As Kelley indicated at her deposition: "That would have made me to stay in the clinic when there was a code." (Kelley Dep. Tr. At 50:6-7.) Lumsden, presently in custody of the clinic keys and wanting to hand them off to another nurse, told Kelley to ask Voorhees to switch, but wanted Kelley to take the clinic keys. (Def.'s Stmt. ¶¶ 59-60.) Kelley says she was agreeable to working in the clinic, but "could not accept the keys . . . because by accepting the keys [she] would be responsible for all the clinic duties." (Pl.'s Response Stmt. ¶ 60.) Her concern was that her leg was bothering her that evening and she might have to respond to a code due to the staff shortage. (Id.; Kelley Dep. Tr. at 63:17-21.)

The normal procedure for transferring the clinic keys includes a "narcotics count." This procedure called for Mr. Lumsden, the outgoing nurse, and an incoming nurse who would work the main clinic during the night shift to count the narcotics together, whereupon Lumsden would pass the keys to the main clinic to that person. (Def.'s Stmt. ¶¶ 61-62.) Neither Kelley nor Voorhees wished to assume this responsibility. (Id. ¶ 63.) According to Kelley, she "could not do the count because, like accepting the keys, by doing the count [she] would be responsible for all the clinic duties," something she did not feel equal to doing that evening. (Pl.'s Response Stmt. ¶ 63.) Kelley does not dispute that she knew the counting procedure and had performed it before in the clinic pharmacy. (Def.'s Stmt. ¶¶ 65-66.) Kelley told Lumsden that she had restrictions on her mobility and that her leg was hurt and bothering her and that she wanted to be switched to the infirmary. She did not tell him that she could not respond to a code blue. (Id. ¶ 68.) However, she did say it would be hard for her to lift the stretcher in a code blue and indicated that she would be able to remain in the clinic in the event of a code blue, if she were stationed in the infirmary. (Id. ¶ 69.)

When Kelley asked Voorhees to switch positions, Voorhees declined. (Id. ¶ 73.) Lumsden left Kelley waiting in the clinic and, when he returned, told her that an understanding was reached with Voorhees and with Ms. Kesteloot, who was reached by phone. That understanding was that both Kelley and Voorhees would work the clinic. (Id. ¶¶ 74-75.) Kelley admits that Lumsden explained to her that "they had talked to Ms. Kesteloot by telephone and that the patients in the infirmary did not require someone to be in there all night." (Id. ¶ 75.) Meanwhile, Ms. Hill performed the narcotics count with Mr. Lumsden and relieved him of the keys so he could leave. (Id. ¶¶ 76-77.)

After Lumsden left, Voorhees did not come out of the infirmary, complaining of only one and a half hours of sleep, whereupon Kelley told Hill that Kelley would have to leave because she could not do the clinic alone. (Id. ¶¶ 79-81.) There was a discussion about having to count the narcotics because Hill wanted to leave. Since Hill had accepted the count from Lumsden, someone else had to accept the count from her. In order for someone to accept the count from Hill, she would have to do the count over again with Hill, and then she would assume custody of the clinic keys. (Id. ¶¶ 82-83.) Kelley explained to Hill her concern over being the only nurse in charge of all clinic duties. (Id. ¶ 84.)

Kelley decided to call Kesteloot at home to request her assistance getting Voorhees to come out of the infirmary and into the clinic (recall that the units are adjacent). (Id. ¶ 86.) Kelley told Kesteloot that she was satisfied with the arrangement that Lumsden had worked out but that Voorhees was refusing to come out of the infirmary. (Id. ¶ 89.) The call was transferred to Voorhees in the infirmary and she and Kesteloot had a conversation. Voorhees came out of the infirmary and said that Kesteloot would be calling back to speak with them all by speakerphone. (Id. ¶¶ 90-92.) This call came to the clinic and Kesteloot, Kelley, Voorhees and Hill were participants. Kelley told Kesteloot that she would not do the narcotics count with Hill because that would put her in charge of the main clinic, something beyond her restrictions. (Id. ¶¶ 95; Pl.'s Response Stmt. ¶ 95.) Kesteloot told Kelley that she wanted Kelley to do the count because Voorhees had already performed the count for the infirmary.[1] (Def.'s Stmt. ¶¶ 98-99.)

---

[1]    CMS explains, again, that someone from the third shift had to do the count again so that Hill's shift could end, notwithstanding the count Hill performed with Lumsden so that Lumsden could leave. (Def.'s Stmt. ¶¶ 102, 104.) Kelley equivocates that Hill and Lumsden had already done the count (Pl.'s Response Stmt. ¶ 98), but she does not deny that the third-shift clinic nurse would be required to participate in another count in order to take the clinic keys. She admits that someone had to do the count with Hill in order for Hill to be able to relinquish the keys. (Id. ¶ 104.) However, she suggests that there was no need to repeat the count at that time because Hill had already done it and Hill "had been working in the Close Unit and now came over to the main clinic." (Id. ¶ 105.) Recall that Hill was already at the end of a double shift. Nevertheless, Kelley is offering a denial about the need for a new count based on an assertion that Hill could serve as the third-shift charge nurse. (Id. ¶¶ 105-106.)

Kelley told Kesteloot that the count had been done by Hill and Lumsden and that she would not accept the keys. (Id. ¶ 103; Kelley Dep. Tr. at 65:12-15.) Kesteloot asked Kelley if Kelley was "refusing to go and count the narcotics and sharps in the clinic as your supervisor is asking you to do," and by supervisor Kesteloot was referring to herself. (Id. ¶ 112.) According to Hill's testimony, Kesteloot said that Kelley would be refusing a direct order if she refused to take the keys and do the count. (Id. ¶ 113.) The last thing that Kesteloot said before the call ended was that she would call back into the infirmary and speak with Voorhees. At the conclusion of the speakerphone conversation, Voorhees said she would do the narcotics count for the main clinic and that "she would do everything." (Id. ¶¶ 109-110, 114-116.)

After the call, Kelley started doing a "double noting" procedure in the clinic. (Id. ¶¶ 117; Kelley Dep. Tr. at 66:3-6.) Voorhees returned to the infirmary and took the call or another call from Kesteloot. Kesteloot instructed Voorhees to arrange for prison security personnel to call Kesteloot at home. Kesteloot later spoke with security and instructed them to escort Kelley from the premises. (Def.'s Stmt. ¶¶ 121-23.) Security arrived to escort Kelley from the premises at around midnight and they were unable to tell Kelley why she was being escorted from the premises. (Id. ¶¶ 125-128.)

At her deposition, Kesteloot testified that Kelley's limitations did not prevent Kelley from serving as the charge nurse in the main clinic. (Id. ¶ 97.) Kelley denies this statement and says that she "could not perform all of the duties of the Clinic because her leg was bothering her, and her permanent restrictions limited her mobility and ability to respond to code blues." (Pl.'s Response Stmt. ¶ 97.) CMS offers statements that Kelley could have performed a code blue and that, even if she could not, there were no other main clinic duties that Kelley could not perform. Kelley denies the ability to do code blues based on mobility restrictions and she also denies

being able to perform "all of the duties" because her leg was bothering her that night, but she does not indicate what other duties she could not perform.  (Def.'s Stmt. ¶¶ 136-138;  Pl.'s Response Stmt. ¶¶ 136-138.)  Kelley admits that Kesteloot had the right to order Kelley to count narcotics on October 17, 2008.  (Def.'s Stmt. ¶ 141;  Pl.'s Response Stmt. ¶ 141.)

Kesteloot was nervous about her decision to have Kelley removed from the premises and consulted the "CMS Success Guide," a personnel policy manual, which contained language indicating that refusing the main clinic assignment is a serious disciplinary offense.  (Def.'s Stmt. ¶¶ 129-131.)  Kelley does not deny that refusing an assignment is a serious disciplinary offense.  (Pl.'s Response Stmt. ¶ 129.)  Following this incident, Kesteloot prepared a written statement and also requested and received one from Voorhees.  (Id. ¶¶ 132-33;  Kesteloot Dep. Ex. 1, Doc. No. 15-3.)  A written statement was also requested of Kelley, which she prepared. (Id. ¶¶ 158-59;  Kelley Dep. Ex. 10, Doc. No. 15-14.)[2]  Kelley was not terminated as of October 17, 2008, and Kesteloot had not yet decided whether to terminate Kelley's employment based on what had transpired.  (Id. ¶¶ 134-135.)  On October 28, 2008, Kesteloot prepared a written recommendation for Kelley's termination.  (Id. ¶ 142, Kesteloot Aff. Ex. C, Doc. No. 15-19.) Kesteloot submitted her termination recommendation to her supervisor, Mr. Amberger, and to CMS's human resources department.  (Def.'s Stmt. ¶ 143.)  Human resources and Kesteloot agreed that termination would be appropriate.[3]  (Id. ¶¶ 144-45.)  CMS's ground for the termination decision was refusing to carry out an order from a supervisor.  (Id. ¶ 146.)  Larry Amberger, regional manager of CMS, instructed Kesteloot to call Kelley and tell her that she was terminated.  On October 29, 2008, Kesteloot contacted Kelley by telephone to explain to her

---

[2]    Kelley's written statement reflects, among other things, her own understanding that she would be "second nurse" in the clinic with Voorhees, not the sole nurse in charge of all clinic duties.
[3]    CMS asserts that human resources exercised the ultimate decision-making authority.  (Def.'s Stmt. ¶ 144.)

that the decision had been made to terminate her, upon instructions from Mr. Amberger.  (Id. ¶¶ 148-49.)

In relation to the claim of defamation, Kelley admits all of the following facts, among others not restated here.[4]  Kelley told PenBay, Crisis & Counseling, and "anywhere else that she applied" for jobs that she had been fired for allegedly refusing to carry out orders from a supervisor.  (Id. ¶¶ 160-61.)  Other employers include T-Mobile and an operator of nursing homes called North Country.  (Id. ¶¶ 162, 167.)  Kelley never received anything from the Maine State Board of Nursing telling her that there had been any information filed against her by CMS and she does not know what information was filed with the Maine State Board of Nursing.  (Id. ¶¶ 163-64.)  Kelley admits that she is unable to give any facts to support the allegation that CMS ever said anything untrue to any of her prospective employers.  (Id. ¶ 169.)  Kelley cannot say which of her prospective employers contacted Ms. Kesteloot at CMS.  (Id. ¶ 170.)

~

The following additional facts are drawn from Plaintiff's Statement of Material Facts (Pl.'s Stmt., Doc. No. 23) and the Defendant's Reply Statement of Material Facts (Def.'s Reply Stmt., Doc. No. 26).  The recitation covers old ground, but introduces additional details and provides Kelley's perspective on certain facts.

Kelley's usual work shift was the night shift.  (Pl.'s Stmt. ¶ 1.)  Kesteloot began working for CMS at the Maine State Prison while Kelley was absent from work due to her horseback riding accident, though Kesteloot was a CMS employee prior to this time.  (Id. ¶ 3;  Def.'s Reply Stmt. ¶ 3.)  During Kelley's accident-related leave—a total of six weeks—CMS extended the leave period by ten days on one occasion, but a human resources specialist for CMS, situated in St. Louis, Missouri, indicated that Kelley would have to be "reduced to PRN status" if she could

---

[4]     CMS's statement offers some particulars that are not material to the determination of its motion.

not return after that extended leave period. (Pl.'s Stmt. ¶¶ 4, 6.) This information is contained in an exhibit consisting of an email from the specialist to Kesteloot. In that email it is written: "If I remember correctly you had an issue about her and PRN status." (Aff. Of Atty. Guy Loranger, Ex. 1, Doc. No. 24-1.) From this limited statement, Kelley extrapolates that Kesteloot did not want to allow Kelley to return to work per diem, which would have afforded Kelley additional time to recover, and that the specialist, whom she never deposed, wanted Kelley to have that opportunity. (Pl.'s Stmt. ¶ 5.) CMS objects to the Court's consideration of the email document, complaining that Attorney Loranger is not competent to attest to the authenticity of the document simply because he received it in the course of discovery. CMS insists that Attorney Loranger needed to authenticate it through a deposition witness, interrogatory request, or another discovery device. Alternatively, CMS admits the statement. (Def.'s Reply preamble and ¶ 4.) CMS's objection presents a sound evidentiary objection for trial purposes, but a pernicious one for summary judgment purposes. Here, CMS's counsel says Kelley's counsel never utilized the document during a deposition or otherwise in discovery. In my view, the self-enforcing sanction for that decision is that Kelley cannot expect the Court to draw all manner of speculative inferences about the author's or the recipient's intentions, when she has failed to develop the record along those lines. Beyond that, the Court might forebear from a summary judgment exclusionary sanction and presume that the document is part of the record and would be available for use by Kelley's counsel during a witness's trial testimony,[5] but the Court cannot

_____

[5] Chief Judge Woodcock has indicated a willingness to consider summary judgment documentary exhibits based on affidavits from individuals without personal knowledge concerning the source or creation of the document in question, at least where the party objecting has not denied the document's authenticity and the cited portions of the document "clearly appear as quoted." Daigle v. Stulc, --- F. Supp. 2d ---, No. 1:09-cv-00353-JAW, 2011 U.S. Dist. Lexis 68676, *9 nn.5 & 6, 2011 WL 2551572, *3 nn. 5 & 6 (D. Me. June 27, 2011) (Order on Mot. for Summary J.) (pending publ'n).

entertain Kelley's personal presumptions about what motives lie behind the document when Kelley has failed to explore those issues during the discovery process.

As for what inferences can be drawn from the email, in my experience PRN is an acronym based on a Latin phrase (*pro re nata*) that translates to "as needed" in English. I do not draw the inference that Kelley requests because it appears as likely that PRN status is a disadvantageous status for an employee to have. Moreover, Kelley's affidavit explains that Kesteloot and she had not yet met one another as of the date of the email. Kelley wants the Court to find that a jury might infer that Kesteloot harbored animosity toward the disabled because the specialist suggested Kesteloot did not like the PRN option. Relying on this bare document for that finding would be an exercise in conjecture.

When Kelley returned to work, Kesteloot wanted Kelley to present her doctor's note on a CMS work form and would have required Kelley to remain out until that was accomplished, but the then Director of Nursing said that Kelley could remain. (Id. ¶ 7.) Such a note was presented on September 14, 2007, and it contained the restrictions previously outlined: crutches for ambulation and restricted bending and squatting. The note also said Kelley could lift, push, and pull as tolerated while seated. (Id. ¶ 8.) On October 3, 2007, another note indicated use of crutches or a wheelchair. (Id. ¶ 9.) On December 17, 2007, another note indicated that bending and squatting should be infrequent. (Id. ¶ 10.) Kelley attests that Kesteloot accused her of lying about the extent of her injuries, saying that a pelvic fracture and missing hip socket would have prevented Kelley from walking again. (Id. ¶¶ 11, 107; Kelley Aff. ¶¶ 4, 8.) When Kelley transitioned from crutches to a cane, Kesteloot insisted that Kelley obtain a new doctor's note because the cane was not specified as a medical accommodation. (Pl.'s Stmt. ¶¶ 15, 17; Kelley Dep. Tr. at 36:21-23; Def.'s Reply Stmt. ¶¶ 15, 17; Second Kesteloot Aff. ¶¶ 9-10, Doc. No.

26-1.)[6]  The matter of restrictions resurfaced again in April 2008, when Kesteloot notified Kelley

that her "restriction sheet" expired and that she needed to complete another form (supplied by

Kesteloot with the notice).  In the notice Kesteloot wrote:  "Until that time, there are no

restrictions concerning your work."[7]  (Pl.'s Stmt. ¶ 20;  Aff. of Atty. Guy Loranger Ex. 2, Doc.

No. 24-2.) Months later, in August 2008, Kelley's doctor updated her restrictions to preclude

working a shift longer than ten and a half hours due to leg and hip pain associated with her

injured hip socket.  (Pl.'s Stmt. ¶¶ 23-24.)

Following her return to work, Kelley worked the main clinic and the infirmary on

occasion.  Sometimes she was one of three nurses staffing the clinic and infirmary, but

sometimes she was one of two.  Sometimes one nurse ran both the clinic and the infirmary, but it

does not appear that Kelley was ever in charge of the clinic on her own.  Kelley was most

commonly stationed in the infirmary, which she describes as a sick bay that required very little

walking.  (Id. ¶¶ 12-13;  Def.'s Reply Stmt. ¶¶ 12-13.)[8]

Kelley explains that, when a code blue occurs, one person would remain in the clinic to

call the doctor, call security, and pull charts.  (Id. ¶ 26.)  Kelley explains that normally she would

be the nurse to remain if she were in the clinic and a code occurred, due to her restrictions.  (Id. ¶

27.)  Kelley indicates that she did not often work in the clinic and that she does not believe she

was ever in charge of the clinic.  (Id. ¶ 28.)  CMS responds that Kelley was very familiar with

the clinic, noting that even when Kelley was stationed in the close unit she still would spend

[6]      As stated by Kelley, Kesteloot "took away" her cane.  (Pl.'s Stmt. ¶¶ 15, 17.)  In her affidavit, Kelley says
Kesteloot told her not to use the cane at work because it was not on the existing doctor's note.  (Kelley Aff. ¶ 8.)
This conforms with Kesteloot's account.  (Second Kesteloot Aff. ¶¶ 9-10.)
[7]      CMS interjects the same objection concerning this notice as it interjected about the email from the human
resources specialist, admitting Kelley's statement, in the alternative.  (Def.'s Reply Stmt. ¶ 20.)  I have considered
the document to be part of the summary judgment record and as speaking for itself, without drawing any
unwarranted inferences about motivation.
[8]      In time, Kelley's typical assignments returned to the close unit. She explains that she did not immediately
return there "because it required a lot of weight bearing movement."  (Pl.'s Stmt. ¶ 14.)

several hours in the clinic during the course of the third shift.  (Def.'s Reply Stmt. ¶ 28, quoting Kelley Dep. Tr. at 20:15—22:15.)

Kelley attests that Kesteloot was very critical of her job performance and would falsely accuse her of unspecified poor performance.  Kelley says she saw write-ups in her employment file authored by Kesteloot, unlike anything she had seen before Kesteloot was her supervisor. (Pl.'s Stmt. ¶ 31.)  Kelley says that Violet (Hanson) Hyatt, now an employee with the Maine Department of Corrections, but once a CMS employee, once told her that Kesteloot "wanted [Kelley] gone."  (Pl.'s Stmt. ¶ 32.)  Kelley described Hyatt as a "member of management."  (Id.) Kelley said Kesteloot would leave messages for Kelley while Kelley was on vacation and then accuse Kelley of avoiding her when Kelley failed to respond.  (Id. ¶ 34.)  Despite this, Kelley states that she received positive feedback on a March 2008 work evaluation for her willingness to cover scheduling needs "in staffing crisis."[9]  (Id. ¶ 36.)

Kelley states that Lumsden himself reshuffled the assignments for the third shift on October 17, 2008, and that he called Kesteloot that evening to tell her that third-shift staff members were not going to be happy with their assignments.  (Id. ¶¶ 37-38.)  Kelley states that Lumsden was not a supervisor for CMS.  (Id. ¶ 39.)  CMS qualifies this by noting that, as an RN on duty in the clinic, Lumsden was "the number one contact" and was "responsible for contacting Ms. Kesteloot" in the event of an emergency or problem.  (Def.'s Reply Stmt. ¶ 39.) Kesteloot's deposition testimony is to this effect and she acknowledges that Lumsden was not a supervisor.  (Kesteloot Dep. Tr. at 22:7-13.)  Ordinarily, nurses on duty form a team and work together as peers.  (Pl.'s Stmt. ¶ 40.)

---

[9]        This statement is drawn from another exhibit attached to the Loranger Affidavit.  Once more, CMS objects based on Kelley's failure to introduce this document through a witness deposition or answer to interrogatory.  CMS also contends that the exhibit is not material.  This objection is different from the prior objections, however, because CMS has itself introduced this exhibit in support of its reply statement as exhibit C to the second affidavit of Teresa Kesteloot.  (Doc. No. 26-4.)

When she arrived for her shift, Kelley informed Lumsden about her restrictions. (Id. ¶ 41.) Kelley told Lumsden that her leg was hurting and that she wanted to be assigned to the infirmary so she could remain in the clinic in the event of a code. She never said that she was restricted from doing codes or would be unable to respond to a code, but she did say it would be hard for her to lift the stretcher. (Id. ¶¶ 44, 46; Kelley Dep. Tr. at 50.) Kelley states that, as of October 17, 2008, one of the accommodations she "had been provided . . . [was] that she would remain in the clinic to notify doctors and security and prepare charts [in the event of a code] rather than physically run to the unit." (Pl.'s Stmt. ¶ 47.) Kelley's deposition testimony indicates that this was the case during the first three months following her return to work. (Kelley Dep. Tr. at 43:24—44:8.) Her testimony otherwise indicates that she did respond to codes in distant locations once or twice in this timeframe. (Id. at 44:25—45:4.) Kelley also expressed to Nurse Hill that she felt serving as charge nurse in the clinic would be too stressful for her in "that she would have to do the runs, that if an inmate called from medium or close or from the SMU, she would have to respond." (Pl.'s Stmt. ¶ 48; Hill Dep. Tr. at 22:22-25.) Close and medium units are "physically a ways away from the main medical unit." (Pl.'s Stmt. ¶ 49.)

When Lumsden learned that Voorhees had declined Kelley request to switch, he had a conversation with Voorhees and Kesteloot, from which it was decided that Voorhees would do "the running around" and Kelley would do the charting. (Id. ¶¶ 54-55.)

Kelley offers the following statement in support of her case, which is supported by her summary judgment affidavit: "Due to staff cuts, Ms. Kesteloot had changed the procedure of the counts so that the outgoing staff did counts so that the incoming staff could get straight to work." (Id. ¶ 58.) CMS denies this statement and offers Kesteloot's affidavit testimony that such a change in procedure would never be authorized given the seriousness of the narcotics transfer concern. (Second Kesteloot Aff. ¶ 22, Doc. No. 26-1.) Kelley states that "Ms. Hill believed the count between

her and Mr. Lumsden was a proper count even though she was not working the third shift." (Pl.'s Stmt. ¶ 61.) However, Hill's deposition testimony does not suggest that the count she did with Lumsden was sufficient to transfer the keys to either Kelley or Voorhees. She clearly testified that one of them would have to do the count over and that Kesteloot wanted Kelley to do it. (Hill Dep. Tr. at 37:4-24.)

After stating that Voorhees refused to come out of the infirmary to "do the count," (Pl.'s Stmt. ¶ 70) Kelley asserts both: (a) "Ms. Kelley had already come to the conclusion that she was going to work in the clinic for that shift and was fine with it" and (b) "Ms. Kelley told Ms. Hill that she was going to have to leave because Ms. Voorhees was refusing to come out and she could not run the clinic due to her leg." (Pl.'s Stmt. ¶¶ 71-72.) Kelley also maintains that Hill told her to leave and said she would cover Kelley's shift. (Id. ¶ 73.)

Hill's recollection of the speakerphone conversation is that Kelley expressed why she was uncomfortable being in charge of the clinic due to lack of comfort with the physical responsibilities if there was an emergency or call from anywhere in the facility. (Id. ¶ 74; Hill Dep. Tr. at 34:14—35:13.) Kesteloot instructed Voorhees to come out of the infirmary to help Kelley in the clinic. (Pl.'s Stmt. ¶ 76.) As for physical ability to perform clinic duties, Kesteloot told Kelley that it was not fair to expect Voorhees to do the count for both the clinic and the infirmary. (Id. ¶ 77.) Nevertheless, Voorhees eventually agreed to count in the clinic. (Id. ¶ 78.) Kelley's characterization is that she never refused to "work" in the clinic, but only refused to accept responsibility and that doing the count would have amounted to responsibility for the clinic. (Id. ¶ 79.) After being instructed not to leave work, upon penalty of termination and a report to the Board of Nursing, Kelley commenced double-noting in the clinic. (Id. ¶¶ 80-81.) Hill and Voorhees proceeded to perform the clinic narcotics count within 10 or 15 minutes of the speakerphone call and security escorted Kelley from the premises after the other nurses had completed the clinic count. (Id. ¶¶ 85-86.)

Kelley "believes" that she and Kesteloot had a conversation sometime in 2008 about Kelley's alleged desire to have a hip replacement surgery in the future and when it might be scheduled. (Id. ¶ 92; Kelley Dep. Tr. at 102:13-15.)

Kesteloot sought statements from Lumsden and Voorhees, but not from Hill.[10] (Pl.'s Stmt. ¶¶ 95-96.)

By way of summary judgment affidavit, Kelley states that she had a telephone conversation with Kesteloot in which Kesteloot told her that she would have to return to full-time work after expiration of her leave or that she would be fired. (Id. ¶ 104.) When she did report to work, Kesteloot told her she could not work because her doctor's note was not on the proper CMS form. This was overridden by the director of nursing. Kesteloot provided the proper form to Kelley and asked: "Seriously, what are your expectations?" Kelley responded that she expected to walk through the prison doors with the use of a cane.[11] (Id. ¶ 105.)

Kelley states in her summary judgment affidavit that a RN on duty on Kelley's first night back told Kelley that Kesteloot wanted the nurse to keep an eye on Kelley and report if there were a part of the job that Kelley could not perform, in which case Kesteloot would fire her. (Id. ¶ 106.) CMS responds that the nurse identified by Kelley was not its employee, so the assertion by Kelley is inadmissible hearsay. CMS also denies the statement by way of the second Kesteloot affidavit. Kesteloot's second affidavit explains that she likely inquired of Kelley's expectations about job duties, that she probably informed Kelley that the CMS form would have to be filled out, that she never told the nurse in question to report so that Kesteloot could fire Kelley or that she wanted Kelley gone or terminated, and that the nurse in question was not an employee of CMS. (Def.'s Reply Stmt. ¶ 106; Second Kesteloot Aff. ¶¶ 5, 11.) Kelley has not sought to be heard on the

---

[10] The cited portion of Kesteloot's deposition transcript relates that this may have been because Hill was a "state nurse," rather than a CMS nurse. (Kesteloot Dep. Tr. at 36:14-17.)

[11] According to other portions of Kelley's statement, she was not actually using a cane at this time. (Pl.'s Stmt. ¶¶ 15, 17.)

hearsay question. Given the absence of any presentation on this hearsay objection to Kelley's affidavit statement, the statement is hereby stricken from the summary judgment record.

Kelley attests that Kesteloot thrice accused her of lying about the extent of her injuries, saying that if Kelley really had no hip socket, as Kelley apparently told her, then Kelley would be bed-ridden. (Pl.'s Stmt. ¶ 107; Kelley Aff. ¶ 8.) Kelley also attests in her summary judgment affidavit that, in the summer and fall of 2008, "Ms. Kesteloot would require me to meet with her in her office before leaving my shift. During one meeting Ms. Kesteloot claimed co-workers had written complaints about me. Ms. Kesteloot then asked me to write a statement in response. I refused." (Pl.'s Stmt. ¶ 108; Kelley Aff. ¶ 9.) Kesteloot acknowledges that she had occasional meetings with Kelley but denies the suggestion that there were mandatory meetings following every one of Kelley's shifts. (Def.'s Reply Stmt. ¶ 108; Second Kesteloot Aff. ¶¶ 13, 14, 23, 24.)

Kelley asserts that responsibility for the main clinic includes responding to code blues, which requires moving pretty quickly. (Pl.'s Stmt. ¶ 109.) CMS offers a qualification that amounts to an admission that this is normally so, but that this evening was different because it was arranged that Voorhees would do any necessary running. CMS also observes that Kelley had responded to code blues on occasion since her return from her accident. (Def.'s Reply Stmt. ¶ 109.) Kelley acknowledges that she had proved capable of responding to code blues, because she next asserts that on this particular evening her pain in her leg prevented it. (Pl.'s Stmt. ¶ 110.)

## DISCUSSION

Kelley filed her complaint in Maine Superior Court and CMS removed it to this Court on the basis of both diversity jurisdiction and federal question jurisdiction. (Notice of Removal, Doc. No. 1.) The caption of the complaint reads: "Plaintiff's Complaint for Violation of the Maine Human Rights Act and the ADA." (Compl., Doc. No. 1-1.) In her complaint, Kelley advances two counts. The first is captioned "violation of the MHRA" and it alleges

"discrimination in violation of the MHRA" and "reckless disregard for the MHRA."  (Id. ¶¶ 22-23.)  It is assumed that this count includes a claim under the Americans with Disabilities Act, due to the caption of the complaint itself.  One factual allegation incorporated into the first count alleges that "CMS terminated Plaintiff because of her disability, her request for a reasonable accommodation, and her need for a reasonable accommodation."  (Id. ¶ 19.)  In her second count, Kelley alleges slander *per se*.  Kelley's allegation is that the slanderous statement consists of a claim that she "refused to carry out the legitimate orders from her supervisor."  (Id. ¶ 25.)  She does not identify the recipients of such a statement, but she alleges her own republication of the statements.  (Id. ¶ 28.)  With its motion, CMS contends that the factual record is insufficient to support a finding of liability on either theory.  (Def.'s Mot. for Summary J., Doc. No. 16.)  The following discussion addresses the two counts in order.

## A.        Disability Discrimination

CMS argues that Kelley fails to put forward a prima facie case of disability discrimination because "she can demonstrate no genuine issue of fact showing that she required an accommodation in order to perform the clinic narcotics count and accept the main clinic assignment on October 17, 2008."  (Id. at 10.)   Additionally, CMS says that its justification for terminating Kelley cannot be rejected as a pretext on this record.  (Id. at 11.)  CMS separately briefs the issue of disability accommodation.  According to CMS, Kelley's claim must fail because she did not require an accommodation in order to count the narcotics in the main clinic and no other accommodation was called for given the absence of a medical restriction against responding to code blues and the fact that Voorhees, in any event, was instructed to work in the clinic with Kelley and would address any code blue that arose.  (Id. at 14-17.)  In its words:

There is no evidence in the record sufficient to establish that CMS denied her an accommodation that forced her to exceed her functional limitations. While it is undisputed that Kelley was not allowed to take the infirmary assignment on October 17, 2008, as she had preferred, it is also undisputed that CMS had no expectation that she would have to respond to code blues during the night shift or that the main clinic duties to which she was assigned were beyond her restrictions.

(Id. at 16.) Finally, CMS disputes the existence of any evidence of retaliatory motive associated with any request for accommodation. (Id. at 17.)

In her opposition memorandum, Kelley relies on a narrative that differs from the facts in certain respects. According to her, after Voorhees refused to switch places, Hill told Kelley to leave and that Hill would cover the shift. In light of the fact that Hill said this to her, Kelley maintains that Hill's subsequent counting of the clinic narcotics placed Hill in charge of the clinic for the third shift. (Pl.'s Opp'n Mem. at 5-6.) In any event, Kelley emphasizes that she "explained . . . that she could not accept the keys to the clinic because her restrictions would not allow her to safely perform all the duties of the charge nurse in the Clinic" and asked "for the simple accommodation of working in the Infirmary." (Id. at 6.) Kesteloot's refusal to agree to this arrangement, in Kelley's view, amounted to a refusal to provide a reasonable accommodation and rendered the later termination decision retaliatory. (Id. at 6-7, 16-17.) As for the core charge of discriminatory animus, Kelley advances an alleged "long history [of] discriminatory animus" (id. at 11-12) and alleged weaknesses in the justifications offered by CMS (id. at 12-15).

Given the nature of this case, the discussion begins with consideration of the failure to accommodate theory. At the very core of the case is a dispute about a specific assignment and whether CMS actually required Kelley to do anything beyond her physical restrictions. As the preceding factual statement relates, Kelley refused an order to perform a narcotics-counting task that was standard operating procedure and was within her physical ability. She refused that

particular task based on a presumption concerning the physical demands of a code blue event that might not happen and that someone else had agreed to handle, should it come to pass. In effect, Kelley's reasonable accommodation claim hinges on a premise that she should not have been put in such a position. I fail to see the genuine issue of material fact that makes this accommodation scenario actionable and believe that this basic problem with the case should be flagged at the fore.

### 1.     *Failure to accommodate*

Under both the Americans with Disabilities Act and the Maine Human Rights Act, the meaning of the term "discriminate" includes failure to provide a reasonable accommodation for the known physical or mental limitations of an otherwise qualified individual with a disability. 42 U.S.C. § 12112(b)(5)(A); 5 M.R.S. § 4553(2)(E). Failure to accommodate a reasonable request that is needed for an employee to perform her job will expose an employer to liability even in the absence of actual discriminatory animus toward the disabled. Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999) (explaining that a failure to accommodate claim does not require a showing of discriminatory animus and that "any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability'").

Four elements govern the analysis of a summary judgment motion challenging a failure-to-accommodate claim: (1) whether the plaintiff is a qualified individual with a disability under the applicable statute; (2) whether the employer is subject to the statute; (3) whether the employer, despite knowing of the employee's physical or mental limitations, did not reasonably accommodate those limitations; and (4) whether the employer's failure to do so affected the terms, conditions, or privileges of the plaintiff's employment. Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 664 (1st Cir. 2010) (citing Higgins v. New Balance Athletic

<u>Shoe, Inc.</u>, 194 F.3d 252, 264-65 (1st Cir. 1999)).  Kelley bears the burden of proof on all four elements.  <u>Id.</u> at 665.

CMS does not raise any challenge in regard to the first two elements of this test.  Instead, CMS argues that Kelley fails to demonstrate why her physical restrictions would have prevented her from counting narcotics in the clinic and why she felt she had been left with the code blue "running" responsibility, assuming that her medical restrictions precluded the latter responsibility.  (Def.'s Mot. for Summary J. at 14-15 & nn. 5, 6.)  As a matter of law, Kelly must propose an accommodation that is reasonable on its face and present significantly probative evidence that the employer failed to respond in a reasonable fashion concerning the requested accommodation.  <u>Gomez-Gonzalez</u>, 626 F.3d at 665.  The requested accommodation must be one that would enable Kelley to perform the essential functions of her job.  <u>Reed v. Lepage Bakeries, Inc.</u>, 244 F.3d 254, 259 (1st Cir. 2001).  "[A]ccommodations are only deemed reasonable (and, thus, required) if they are needed because of disability[.]"  <u>Marcano-Rivera v. Pueblo Int'l, Inc.</u>, 232 F.3d 245, 257 (1st Cir. 2000).

Kelley's position is that she should have been granted "the simple accommodation to not be the charge nurse in the main clinic."  (Pl.'s Opp'n Mem. at 16.)  Kelley does not suggest that she could not work in the clinic, only that she should not have been designated the title of charge nurse because of her understanding of the duties that normally go with that title.  However, Kelley was not going to be the only nurse working in the clinic that evening.  The record reflects that Kesteloot instructed Voorhees to leave the infirmary, which did not require a staff person, and to work with Kelley in the main clinic.  The record also reflects that Voorhees had twice indicated that she would do the running;  once before Kesteloot's speakerphone call and once during that call.  Consequently, Kelley's desired accommodation was to be relieved of

performing the clinic narcotics count simply so that she would not become custodian of the clinic keys. There is no reasonable explanation that I can see why a special accommodation was required to prevent Kelley from serving as the titular "charge nurse" or to spare her from counting the clinic narcotics and holding the keys of the main clinic, when she was not expected to do the code blue running, the only task that was allegedly beyond her physical ability that evening. In effect, because Kelley and Voorhees were instructed to work in the main clinic together and Voorhees was designated to do the running, Kelley's alleged need to avoid code blues that particular evening was reasonably accommodated.

Although it would have been possible to switch Voorhees and Kelley's scheduled shifts around so that Kelley could be the infirmary nurse, Kelley has admitted that she was informed that there was no need for any nurse to be stationed in the infirmary during the third shift. Given the lack of a need for a nurse to be physically present in the infirmary and the decision to have both Voorhees and Kelley work in the main clinic, Kelley fails to demonstrate that it was reasonable (let alone necessary) for her shift designation to be formally changed that evening. The only material concern was who would do the running. Even Kelley asserts that she was refusing to do the count and take the keys out of concern that she would have to do the running. Once she was relieved of that duty there was no reasonable accommodation-related basis for her to refuse the assignment of counting the clinic narcotics with Hill so that Hill could be relieved of the keys to the clinic.

Federal regulations designed to implement the accommodation requirement of the ADA state:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should

> identify the precise limitations resulting from the disability and potential
> reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). Though not controlling, such regulatory guidance is appropriately considered in the summary judgment context. Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 104 n.13 (1st Cir. 2007). "The employer has an obligation upon learning of an employee's disability to 'engage in a meaningful dialogue with the employee to find the best means of accommodating that disability.'" Id. at 104 (quoting Tobin v. Liberty Mut. Inc. Co., 433 F.3d 100, 108 (1st Cir. 2005). The employee also has an obligation to participate in a "flexible, interactive process" with the employer. Id.; see also Calero-Cerezo v. United States Dept. of Justice, 355 F.3d 6, 23-24 (1st Cir. 2004). As in Freadman, the record in this case demonstrates that an informal process transpired in this case. That informal process included an arrangement that spared Kelley the potential strain of having to run for any code blues that evening. Because the potential strain of running for code blues was the only duty that implicated Kelley's physical restrictions, CMS provided Kelley a reasonable accommodation. Kelley's status as a protected employee did not entitle her to refuse a reasonable accommodation or work assignments that did not implicate her physical restrictions. Freadman, 484 F.3d at 104. For these reasons, I recommend that the Court grant summary judgment to CMS on the failure to accommodate component of the first count.

### 2. *Discriminatory animus*

The discrimination theories remaining to Kelley require a showing of discriminatory or retaliatory animus. Both the ADA and the MHRA prohibit employment discrimination based on disability or based on engagement in the protected process of requesting accommodation for a disability. 42 U.S.C. §§ 12112(a), 12203(b); 5 M.R.S. § 4572. To overcome the summary judgment motion against these claims Kelley must raise a genuine issue whether she was fired

because of her disability or because she engaged in the protected conduct of requesting an accommodation. Carreras v. Sajo, 596 F.3d 25, 35 (1st Cir. 2010) (retaliation); Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104 (1st Cir. 2005) (disability discrimination). For present purposes, the only concern is with the quality of the evidence related to the causal relationship between Kelley's disability or protected conduct and her discharge. This is so because CMS does not dispute that Kelley is a qualified person with a disability or that she engaged in the protected process of requesting an accommodation. Additionally, the fact of Kelley's termination establishes the existence of an adverse employment action. Consequently, the question is whether the evidence supports a finding that the decision to terminate Kelley's employment was motivated by animus toward her because she is disabled person or because she requested accommodation.

Whether the Court reviews the record for circumstantial evidence of discriminatory motive or for circumstantial evidence of retaliatory motive, the process is governed by the McDonnell Douglas burden-shifting paradigm. Carreras, 596 F.3d at 36 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)); Tobin, 433 F.3d at 104 (same); Doyle v. Dep't of Human Servs., 824 A.2d 48, 54, 2003 ME 61, ¶ 14 (MHRA, same). This paradigm initially places the onus on the plaintiff to make a prima facie showing that an adverse employment action befell her because of her protected status. The prima facie showing imposes a "relatively light burden," Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007), but is not itself sufficient to demonstrate unlawful motive in the absence of direct evidence of discriminatory or retaliatory purpose or in the absence of a showing by the employer that a legitimate explanation exists for the adverse employment measure. Here, the record is devoid of direct evidence of animus, so, assuming Kelley meets her prima facie burden, the paradigm will

require CMS to put forward a legitimate, non-discriminatory explanation for sacking Kelley. CMS's burden is "one of production, not persuasion." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142 (2000). If CMS produces a non-discriminatory reason for Kelley's termination, then the burden returns to Kelley, who must demonstrate that the explanation offered by CMS is a pretext and that evidence of record supports an inferential finding of discriminatory or retaliatory motive. <u>Carreras</u>, 596 F.3d at 36; <u>Tobin</u>, 433 F.3d at 105.

      a.    <u>The prima facie case</u>

CMS argues that Kelley fails in her prima facie showing. According to CMS, it "was not legally obligated to engage Ms. Kelley in an interactive dialogue on October 17, 2008 concerning any reasonable accommodation . . . since she can demonstrate no genuine issue of fact showing that she required an accommodation in order to perform the clinic narcotics count and accept the main clinic assignment." (Def.'s Mot. for Summary J. at 10.) Although I found this argument persuasive for purposes of the failure to accommodate theory, it does not carry the day for the discrimination and retaliation theories. Kelley requested an accommodation on October 17, 2008, and even though it was not necessary to relieve Kelley of the narcotics counting duty for the clinic, Kelley still retains protected status as a disabled employee and as an employee who engaged in protected conduct. An employee who is disabled and who can perform a particular job duty without an accommodation is still a disabled employee. Additionally, Kelley raised an issue related to her mobility when she discovered that she was assigned to the main clinic (which would ordinarily come with code blue response duties) and that mobility issue was reasonably addressed in the course of an interactive process. Thus, Kelley was not only a disabled employee, but also one who had engaged in protected activity.

The record is sufficient to satisfy the relatively light requirement of the prima facie summary judgment standard.

        b.        The legitimate, non-discriminatory explanation

CMS produces admissible evidence that its reason for terminating Kelley's employment was that she refused an order to perform the narcotics count for the main clinic. CMS has also provided evidence that this amounted to a serious disciplinary offense. (Def.'s Stmt. ¶¶ 124, 129, 134, 146, 147.) This is enough to carry CMS's burden of production and return the burden to Kelley.

        c.        Pretext and motive

CMS contends that Kelley cannot reasonably dispute that its motive for terminating her employment was, in fact, her refusal to follow the instruction that she perform the narcotics count for the main clinic. (Def.'s Mot. for Summary J. at 11-13.) Kelley responds that the record is rife with evidence of the pretextual nature of this explanation and of actual discriminatory and retaliatory animus. (Pl.'s Opp'n Mem. at 10-17.) Based on the summary judgment factual record, I conclude that Kelley has failed to make a viable showing of pretext or of animus.

Kelley alludes to "Ms. Kesteloot's long history of discriminatory animus towards Ms. Kelley." (Id. at 11.) In part, Kelley's presentation on that score is based on inadmissible hearsay evidence that a nurse was asked to keep an eye on Kelley and report to Kesteloot if Kelley could not perform her job. (Id.) I have put that assertion to the side because I have found it inadmissible and have sustained CMS's request that it be stricken.[12] In part, Kelley's presentation depends on an assertion that Kesteloot subjected her to perpetual false accusations

---

[12]     A sworn statement or deposition testimony from the nurse in question would have served Kelley much better, if the alleged witness was available.

and complaints concerning performance issues (id. at 12), but Kelley fails to develop the facts that might support this otherwise conclusory assertion, both as to frequency and as to falsity. This fault extends to the contention that "Ms. Kesteloot also required Ms. Kelley to meet with her before leaving her shift." (Id. at 12.) The record does indicate that Kelley was made to report on occasion, but Kelley has not actually sworn that this was a constant prerequisite to checking out of work. What she attests is: "During the summer and fall of 2008, Ms. Kesteloot would require me to meet with her in her office before leaving my shift." (Pl.'s Stmt. ¶ 108; Kelley Aff. ¶ 9, Doc. No. 25.) The phrase "would require" does not reasonably call for an assumption that this was a routine requirement rather than a sporadic requirement. CMS has directly addressed the slack in Kelley's word choice by providing affidavit testimony explaining that there were occasional office visits. (Def.'s Reply Stmt. ¶ 108; Second Kesteloot Aff. ¶¶ 23-24, Doc. No. 26-1.) Kelley's inexact word choice does not justify an inference of a routine rather than occasional requirement.[13] In the absence of any reliable evidence that she was routinely required to check out at Kesteloot's office, the Court cannot assume the existence of disparate treatment. Kelley has not presented any evidence that other nurses were not required to visit with Kesteloot in her office for performance-related discussions on occasion and she has not developed the record to allow for a reliable finding of unfair evaluations.

In part, Kelley depends on a desired finding that Kesteloot harbored animosity toward her because she never offered Kelley "PRN" status following Kelley's medical leave. (Id. at 11.) Yet Kelley does not show that she had an entitlement to that status or that she ever requested or needed that kind of accommodation. Moreover, Kelley has not developed a record to show that

---

[13]      In its reply memorandum, CMS suggests that the Court review exhibit C to the second Kesteloot affidavit. (Def.'s Reply Mem. at 4.) The exhibit contains a performance review containing both positive and less than positive assessments and also various memorandum concerning performance issues. (Doc. No. 26-4.) The parties made only limited use of the exhibit in support of statements of material fact and, consequently, I have not ventured to relate it contents.

any other employees who went out on similar leave were provided PRN status and still transitioned back to regular status. This line of inquiry is entirely undeveloped and Kelley merely relies on an innocuous email. At most, this evidence and the remaining evidence[14] that Kelley points to simply support the inference that Kesteloot was a stickler for internal procedure related to disability accommodation. An employer cannot fairly be regarded as harboring animus toward the disabled for insisting on the observation of accommodation-related formalities.

Kelley also offers a three-page list of bullet points pertaining to her pretext burden. (Pl.'s Opp'n Mem. at 12-15.) The summary she offers is that the order to count narcotics was a pretext because the count had already been performed by Hill. However, Kelley continues by arguing that a jury might well infer that she did not refuse the count because Voorhees did the count. (Id. at 15.) Why did Voorhees do the count if Hill's count sufficed? The record supplies the answer: a nurse working in the clinic for the third shift was required to perform the count as she or he would be assuming responsibility for the narcotics. Additionally, Kelley suggests that the clinic assignment was beyond her qualifications, meaning that she was set up. (Id.) The facts tell a different story. Kelley's own factual presentation states that Lumsden "reshuffled the assignments for the third shift" and called Kesteloot to advise her that third-shift employees would not be happy. (Pl.'s Stmt. ¶¶ 37-38.) Kelley's own statement relates that Kesteloot

---

[14]     This evidence includes the assertion that "Ms. Kesteloot took away Ms. Kelley's cane." (Pl.'s Opp'n Mem. at 12.) The hyperbolic nature of this turn of phrase has already been addressed in the fact section of this Recommended Decision. This evidence also includes the representation that Kesteloot was incredulous at the suggestion that Kelley had "no hip socket." The record demonstrates that Kelley was accommodated during more than a year of post-accident employment. It also indicates that Kelley was not the only nurse in CMS's employ with a serious hip condition. This assertion concerning Kesteloot's unbelieving assessment about a missing hip socket (certainly an alarming proposition) does not warrant an inference that Kesteloot harbored animosity toward Kelley because she required a workplace accommodation. Moreover, Kelley's attestation that Kesteloot "accused" her of "lying" is her own subjective interpretation of a conversation concerning the extent of her injuries. Just as Kelley failed to present any definite evidence concerning the frequency of her visits to Kesteloot's office, she has also failed to provide "definite, competent evidence" of what Kesteloot actually said. See Torrech-Hernandez, 519 F.3d at 47 & n.1. A fact finder could easily accept that Kesteloot expressed skepticism and doubt that Kelley was missing a hip socket, but that does not mean it would be reasonable to infer that such skepticism revealed discriminatory animus toward the disabled.

participated in a work-around that called for Voorhees to come out of the infirmary and assist Kelley in the main clinic, including doing all of the running. (Id. ¶¶ 54-56.) Kelley has admitted that this scheduling concern arose due to an additional call out. (Def.'s Stmt. ¶ 49; Pl.'s Response Stmt. ¶ 49.) Kelley has also acknowledged that procedure called for a count to transpire in order for the keys to travel from one employee to the next. The count performed by Hill does not demonstrate pretext because Hill did the count to relieve Lumsden. There is no indication in the record that Hill was expected to cover the clinic during the third shift. Kelley and Voorhees were supposed to run the clinic together during the third shift.

As to qualifications, Kelley was experienced in the narcotics-counting task and had performed it previously. The record does not suggest that requiring her to count the narcotics was beyond her qualifications when she routinely performed that task as part of her work. Even as to being the titular charge nurse, the record shows that this concern was addressed both before the speakerphone call and during it. Kesteloot directed that Voorhees would work with Kelley in the clinic and also that Voorhees would do the running. Kelley's showing does not demonstrate an assignment beyond her professional qualifications, let alone her physical restrictions. Nor does it serve Kelley to say that pretext is demonstrated by Voorhees's eventual willingness to perform the clinic count. (Id. at 13.) By that time Kelley has already told Kesteloot that she would not do it. Perhaps the greatest irony in this line of argument is found in Kelley's memorandum footnote to the effect that, if only Voorhees had come out of the infirmary earlier, "the issue would have been resolved at that point." (Id. at 13 n.4.) It is impossible to reconcile this statement with Kelley's refusal to perform the narcotics count even after Voorhees came out and Kesteloot indicated by speakerphone that Voorhees would work in the clinic with Kelley.

Kelley asserts that a jury might infer that Kesteloot is lying about what transpired that evening because of an alleged conflict between Kesteloot's account and Hill's account. (Id. at 13-14.) This argument depends on a convoluted interpretation of the record. According to Kelley's argument, Kesteloot has denied "that Kelley expressed her physical inability to work as charge nurse in the clinic." (Id. at 14.)[15] However, the record reflects that the only physical issue concerned code blues and that issue was acknowledged and addressed even prior to the speakerphone exchange. As Kelley elsewhere argues—seemingly at cross purposes—Kesteloot instructed Voorhees to come out of the infirmary to assist Kelley (id.), partly by assuming responsibility for codes. Kelley would have it that this accommodation is actually proof of discriminatory animus.

Kelley asserts that a jury might believe her when she says that she did not refuse to do the count. (Id. at 14.) I do not know what evidence a jury would rely on in order to make that finding. She stated she would leave rather than do the counting and she did not accept the assignment of counting the narcotics even after Kesteloot told her it was an order.[16] Kelley's statement that she did not refuse the count (Pl.'s Stmt. ¶ 79) is based on Hill's deposition testimony. The cited portion of that testimony includes the following:

> A    She refused to accept the count in the clinic. She did not want the responsibility of the clinic keys. . . . In accepting the keys for the clinic and the narcotics count that meant that you, the person accepting that is responsible for the clinic.

---

[15]    This assertion is also found in Plaintiff's Statement, paragraph 75. Kelley cites three lines of Kesteloot's deposition transcript (Doc. No. 15-2). The passage reads as follows:
> Q    It's your understanding that Kathy's [Kelley's] desire to go to the infirmary had nothing to do with any limitations?
> A    No.
(Kesteloot Dep. Tr. at 23:24—24:1.) According to the transcript, it was not Kesteloot's understanding that Kelley's concern was unrelated to her limitations.

[16]    In opposition to CMS's statement that she had committed a serious disciplinary offense, Kelley says she "did not refuse to work in the Main Clinic [but] just refused to accept the keys and responsibility for the Main Clinic by doing the count and becoming the charge nurse." (Pl.'s Response Stmt. ¶ 129.)

(Hill Dep. Tr. at 36:11—36:17.) The witness that Kelley relies on says that Kelley refused to accept the count. Kelley's own presentation reflects that she disobeyed an order.

Kelley says the alleged need for two nurses in the clinic is itself a pretext based on misinformation about double noting orders and that she should have been allowed to switch assignments with Voorhees. (Pl.'s Opp'n Mem. at 15.) However, the record indicates that no one was needed to staff the infirmary and that Voorhees was reassigned to assist Kelley in the clinic. There is no sign of pretext in having two nurses in the clinic. Kelley's own presentation reflects that it is not out of the ordinary to have more than one nurse in the clinic. Kelley had previously worked in the clinic with two other nurses. (Pl.'s Stmt. ¶ 13.)

Kelley says Kesteloot wanted to fire her because Kelley was in need of a future operation that would take her out of work for three months. (Pl.'s Opp'n Mem. at 15.) The statement underlying this relies on Kelley's deposition testimony:

Q     And so despite your doctor's recommendation that you have the surgery in July of 2008 you declined to do so?

A     I didn't decline, he said call me when you are ready. I was waiting to build up some vacation time to go out for three months.

Q     Other than your desire to build up vacation time was there any reason why you could not have had the surgery done in the summer of 2008?

A     No, and it was closer to the fall, and [another nurse] had a series of—I believe both her hips were operated on, it—she went out first. I was going out after.

Q     Was that your decision?

A     Common courtesy.

Q     Did you talk to your employer about your need to have this surgery and when you could possibly have it scheduled?

A     I believe that Teresa [Kesteloot] and I had had a discussion.

(Kelley Dep. Tr. at 101:25—102:15.)  Assuming that this discussion occurred, there is no basis to know what was said or even to infer that Kelley would have told Kesteloot that she needed or even planned on taking three months of leave.  This factual presentation offers no insight into the existence of a discriminatory motive.  It is simply a request for a conjectural finding. As CMS states:  "Nothing in that testimony allows an inference that Ms. Kesteloot reacted adversely to that disclosure, refused to allow Kelley to schedule a second surgery or took any negative action in response. . . .  The record is silent regarding how Ms. Kesteloot actually responded during the discussion Kelley believes she had."  (Def.'s Reply Mem. at 7, Doc. No. 27.)

Finally, Kelley argues that Kesteloot stacked the deck against her following the October 17 incident because Kesteloot requested a statement from Voorhees but not from Lumsden or Hill.  (Pl.'s Opp'n Mem. at 15.)  Lumsden was not present by the time the terminable transgression occurred, which would tend to explain why he might not have been asked.  Additionally, Kelley is contradicting her statement, which says that Kesteloot sought a statement from Lumsden.  (Pl.'s Stmt. ¶ 95.)  Kelley's presentation suggests that the Court might recognize that a statement from Hill would have been more favorable to her and that Kesteloot avoided getting a statement from Hill for this reason.  The record does not tend to support this supposition.  Moreover, the record reflects that Hill was a state-employed nurse and not subject to Kesteloot's supervision.  The failure to request a statement from Hill is explained by an actual issue of authority.  This final bullet-point assertion does not raise a genuine issue as to the existence of discriminatory animus independently or in combination with the assertions that precede it.

Kelley's utilization of the summary judgment record relies heavily on supposition, conjecture, misleading word choice, mischaracterization of testimony, and hyperbole and

ultimately fails to shed light on a subjective motivation on the part of the relevant decision maker(s) to terminate her employment because of her disability or because she requested an accommodation of her physical condition.  Apart from the arguments made by Kelley, I see no other viable basis for reliably finding animus toward the disabled rather than animus toward a refusal to comply with a reasonable order.  Kelley has not argued that the sanction of termination for such an offense is more severe than what would have befallen anyone else who refused an assignment.  She did not even deny that refusing an order is a serious disciplinary offense.  Nor has she developed evidence of disparate treatment along those lines.  The mere fact of her termination under these circumstances does not itself raise an inference of pretext or of discrimination or retaliation, particularly as Kelley has not presented evidence of a sterling performance record.  Cf. Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 243 (1st Cir. 2006) ("The severity of the discipline that Jordan's Meats meted out as a consequence—termination of employment—does not itself raise any inference of pretext or of discrimination or retaliation.").  If Kelley was unable to uncover a similar incident of insubordination by another employee for purposes of comparison, it may well be due to the seriousness of her misconduct.  For the law to insist that CMS retain Kelley despite such conduct would effectively permit Kelley to dictate what work tasks she would perform, irrespective of disability, a marked departure from the objectives of anti-discrimination law.[17]  The law protected Kelley by prohibiting disparate adverse treatment and affording reasonable accommodation, but she has failed to uncover disparate adverse treatment, a denial of reasonable accommodation, or reliable evidence that her protected status was the reason for her termination.  Given the nature of the record, I recommend

_____

[17] The record otherwise reflects that Kelley remained in CMS's employ for more than a year following her disabled status and need for some accommodation, that performance reviews included some positive assessments and recognition of Kelley's willingness to assist with staffing problems, that there is an absence of any derogatory remarks concerning the disabled, and that Kelley's refusal to perform an important narcotics counting task that was within her physical ability and experience was the precipitating factor in her discharge.

that the Court grant summary judgment to CMS on the disability discrimination and retaliation theories of count one, in addition to the reasonable accommodation theory.

**B.      Slander**

CMS argues that Kelley cannot make a prima facie showing of slander on the record because she has never pleaded what the allegedly slanderous statements were or to whom they were made, making a truthfulness inquiry impossible.  Additionally, CMS says that any statement to the effect that Kelley refused a legitimate order would have been a true statement and therefore non-actionable.  (Def.'s Mot. Summary J. at 19.)  In addition to asserting truth, CMS disputes Kelley's ability to demonstrate abuse of the conditional privilege.  (Id. at 18 n.8, 20 n.9.)  Kelley's opposition memorandum on this count begins:  "Ms. Kelley alleges slander per se based on Ms. Kesteloot's statement that she fired Ms. Kelley for refusing to carry out legitimate orders."  (Pl.'s Opp'n Mem. at 17.)  She says such a statement is slanderous *per se* because it concerns her occupation.  (Id. at 18.)  Kelley says that she "has submitted substantial evidence that she did not refuse to carry out a legitimate order."  (Id.)  As for publication, Kelley relies on publication within the CMS organization, her own self-publication to prospective employers, and alleged publication to the Board of Nursing, the "Unemployment Division," and the Maine Human Rights Commission.  (Id. at 18-19.)

*1.      The elements of slander*

To raise a genuine issue in support of her slander claim, Kelley must adduce evidence capable of supporting a finding of:  (1) a false and defamatory statement concerning her;  (2) an unprivileged publication to a third party;  (3) fault amounting to at least negligence on the part of the publisher;  and (4) either actionability of the statement irrespective of special harm or the

existence of special harm caused by the publication.  Lester v. Powers, 596 A.2d 65, 69 (Me. 1991).

As for having a defamatory quality:  "A statement is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."  Rippett v. Bemis, 672 A.2d 82, 86 (Me. 1996) (internal quotation marks omitted).  Although defamatory in nature, a statement is not actionable unless it is also false.  Truth is an absolute defense against a charge of defamation.  Galarneau v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 504 F.3d 189, 198 (1st Cir. 2007).

As for privilege:  "A conditional privilege against liability for defamation arises in settings where society has an interest in promoting free, but not absolutely unfettered, speech."  Cole v. Chandler, 752 A.2d 1189, 1193, 2000 ME 104, ¶ 6.  As a matter of law, this privilege applies in the context of employment performance-related scenarios, and the conditional privilege will shield the employer unless the privilege was abused.  Id. at 1193-94, ¶¶ 5, 7.  "Once it is determined that the defendant is entitled to the privilege, the burden shifts to the plaintiff to come forward with evidence that could go to a jury that the defendant abused the privilege."  Id. at 1194, ¶ 7.  Abuse includes making the statement outside normal channels or with malicious intent.  A showing of malice requires evidence that the originator of the statement knew the statement was false, recklessly disregarded whether it was true or false, or acted with spite or ill will.  Id.  Abuse of the privilege presents a question of fact, but that does not mean that the question cannot be resolved against the plaintiff at summary judgment.  See id. ¶ 8 (affirming trial court's summary judgment finding that the employer did not abuse the conditional privilege).

As for publication, pursuant to Maine common law, defamatory "intra-corporate communications" made by a corporate agent about an employee will expose the corporation to liability for defamation even if the publication is kept "within the corporate community." Staples v. Bangor Hydro-Elec. Co., 629 A.2d 601, 603-604 (1993) (involving a supervisor's statements to the plaintiff's co-workers and the company's director of personnel). Additionally, "compelled self-publication" occurs when the defamed person is forced into a position of publishing a defamatory statement about himself or herself. See Gomes v. Univ. of Me. Sys., 365 F. Supp. 2d 6, 46 (D. Me. 2005); Carey v. Mount Desert Island Hosp., 910 F. Supp. 7, 11-12 (D. Me. 1995). As observed in Gomes: "The Maine Supreme Judicial Court has reserved judgment on whether Maine law permits a defamation claim based upon compelled self-publication; however, this Court has concluded Maine would recognize this legal theory." 365 F. Supp. 2d at 46 (citing Cole v. Chandler, 752 A.2d 1189, 1193, 2000 ME 104, ¶ 5 (reserving the issue), Carey v. Mt. Desert Island Hosp., 910 F. Supp. 7, 11-13 (D. Me. 1995) (predicting that compelled self-publication will serve under Maine common law, but precluding re-publication to friends and family), and Smith v. Heritage Salmon, Inc., 180 F. Supp. 2d 208, 222 (D. Me. 2002), (following Carey)).

As for actionability irrespective of special harm: "False statements are defamatory *per se* if they relate to a profession, occupation, or official station in which the plaintiff was employed." Galarneau, 504 F.3d at 198. Although a statement may be defamatory *per se*, it is not actionable if it is privileged. Id.

### 2.    *Analysis of the record*

The record is sufficient to demonstrate the following elements of the legal standard: a statement that is defamatory *per se* coupled with an intra-corporate communication from

Kesteloot to her CMS superiors and compelled self-publication to prospective employers.[18]

However, the record is not sufficient to permit an inference that Kesteloot lacked "a reasonable basis in fact" to assert that Kelley refused to carry out a direct order. Garrett, 295 F.3d at 106. Truth is established by the record, which is to say that Kelley fails to raise a genuine issue as to the existence of falsity. At best, her factual presentation attempts to offer a justification for her refusal. This justification has no foundation, as already explained, because directing Kelley to perform the narcotics count did not entail a requirement that she exceed her physical limitations, in light of the fact that she had been relieved of code blue responsibility. Kesteloot spoke truthfully when she said that Kelley refused an order. The non-actionability of Kesteloot's statement is backstopped by the conditional privilege. Kelley's summary judgment presentation offers no evidence that Kesteloot made the statement outside the normal channels and is otherwise insufficient to support a finding of reckless disregard for the truth, spite, or ill will. Indeed, the record evidence concerning Kesteloot's description of what transpired is consistent, in the main, with Kelley's version. That fact precludes a finding of reckless disregard for the truth.

### 3. The pleading problem

CMS additionally argues that the Court should dismiss the defamation count on a pleading technicality. It is recognized that a defendant in a libel or slander case has a right to know the substance of the statements that underlie the action. Hawkins v. Kiely, 250 F.R.D. 73,

---

[18]     Maine's unemployment law extends an absolute privilege over communications with unemployment-related agencies and agents. 26 M.R.S. § 1047 ("All information transmitted to the bureau, the commission or its duly authorized representatives pursuant to this chapter is absolutely privileged and may not be made the subject matter or basis in any action of slander or libel in any court in this State."). The Maine Health Security Act also extends protection over mandatory reports concerning professional competence. 24 M.R.S. § 2511. This immunity may well be absolute for a provider like CMS. Id.; see also McCullough v. Visiting Nurse Serv.,691 A.2d 1201, 1205, 1997 ME 55, ¶¶ 13-14 (reserving the question). Statements made to the Maine Human Rights Commission are similarly shielded by operation of common law authorities. LaPlante v. United Parcel Serv., 810 F. Supp. 19, 21 (D. Me. 1993).

75 (D. Me. 2008); Sandler v. Calcagni, 243 F.R.D. 24, 25 (D. Me. 2007); see also Bishop v. Costa, 495 F. Supp. 2d 139, 140 (D. Me. 2007) (recognizing the need for some detail, but not the extent of detail required under Rule 9(b) for pleading fraud). Typically, when the defendant truly lacks notice of the substance of the claim, the defendant ferrets out the statement(s) by means of a Rule 12(e) motion for a more definite statement or a Rule 12(b)(6) motion to dismiss for failure to state a claim. Here, CMS is attempting to turn a pleading concern into a summary judgment trap. Kelley responds that she identified the statements underlying her second count in her answers to interrogatories. (Pl.'s Opp'n Mem. at 18.) CMS has not challenged this response in its reply memorandum or suggested that Kelley is now attempting to extend her claim beyond the notice she provided to CMS. I fail to see the reasonableness of applying the pleading requirement as a bar against the consideration of the evidence on the merits in this case, though I recognize that plaintiffs have, in some instances, been precluded from being heard concerning defamatory statements that have never been articulated in their pleadings. See, e.g., Veilleux v. NBC, 8 F. Supp. 2d 23, 36 (D. Me. 1998) (limiting plaintiffs to statements asserted to be defamatory in the complaint and stating that plaintiffs "may not allege as defamatory any additional statements unless and until they amend their Complaint"). If the summary judgment record failed to introduce evidence of any statements, then dismissal would be appropriate. If the summary judgment record introduced statements the defendant had never been notified of, then it would be appropriate to disregard those statements. Here, however, CMS's own statement of material facts supplies adequate particulars concerning the statements at issue.

## CONCLUSION

For the reasons set forth above, I RECOMMEND that the Court GRANT Defendant's

Motion for Summary Judgment and enter judgment for Defendant on Plaintiff's Complaint.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

August 8, 2011